## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| JASON WHITE, | ) | CASE NO. 1:25-CV-1050 |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE |
| | ) | JENNIFER DOWDELL ARMSTRONG |
| v. | ) | |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | **MEMORANDUM OPINION AND** |
| SECURITY, | ) | **ORDER** |
| | ) | |
| Defendant. | ) | |

## I.      INTRODUCTION

The Commissioner of Social Security denied Plaintiff Jason White's application for Supplemental Security Income (SSI). Mr. White seeks judicial review of that decision pursuant to 42 U.S.C. §§ 405(g) and 1383(c). (Compl., ECF No. 1.) The parties have consented to a magistrate judge exercising jurisdiction over the case pursuant to 28 U.S.C. § 636(c), Rule 73 of the Federal Rules of Civil Procedure, and Local Rule 73.1. (Consent and Order, ECF No. 7.)

For the reasons set forth below, the Court AFFIRMS the Commissioner's decision denying Mr. White's application for benefits.

## II.      PROCEDURAL HISTORY

In February 2023, Mr. White applied to the Social Security Administration (SSA) seeking SSI.[1] (Tr. 173.) He initially claimed that he became disabled on October 15, 2018, but at the hearing his counsel amended that date to September 1, 2022. (*Id.*; Tr. 44.) He identified three allegedly disabling conditions: (1) herniated disc; (2) chronic pain; and (3) osteoarthritis. (Tr. 202.)

---

[1] The administrative transcript appears at ECF No. 8. I will refer to pages within that transcript by identifying the Bates number printed on the bottom right-hand corner of the page (e.g., "Tr. 32"). I will refer to other documents in the record by their CM/ECF document numbers (e.g., "ECF No. 9") and page-identification numbers (e.g., "PageID# 984").

The SSA denied Mr. White's application initially and upon reconsideration. (Tr. 90, 97, 98, 105.) Mr. White requested a hearing before an administrative law judge (ALJ). (Tr. 120.) His counsel submitted a brief in advance of the hearing. (Tr. 296–325.) The ALJ held a hearing on January 11, 2024, at which Mr. White was represented by counsel. (Tr. 37–66.) Mr. White testified, as did an independent vocational expert. (*Id.*)

On April 18, 2024, the ALJ issued a written decision finding that Mr. White is not disabled. (Tr. 15–32.)

Mr. White requested review of the ALJ's decision. (Tr. 171–72.)

On March 26, 2025, the Appeals Council denied review, rendering the ALJ's decision final. (Tr. 1.)

On May 22, 2025, Mr. White filed his Complaint, challenging the Commissioner's final decision that he is not disabled. (ECF No. 1.) Mr. White asserts the following assignments of error for review:

> **First Assignment of Error:** The ALJ committed reversible error in the evaluation of Mr. White's pain and its impact on his residual function capacity.

> **Second Assignment of Error:** The ALJ's finding as to a light residual functional capacity was premised on reversible legal error with incorrect reliance on insufficient reviewing physicians' opinions, without properly weighing current objective and opinion evidence.

(Pl.'s Merit Br. at 9, 13, ECF No. 9, PageID# 984, 988.)

## III.     BACKGROUND

### A.     <u>Previous Application for Social Security Benefits</u>

Mr. White previously applied for SSI benefits on September 29, 2020, alleging disability beginning in February 2019. (Tr. 70.) An ALJ issued a written decision denying the application on August 31, 2022. (Tr. 67.) In that decision, the ALJ found that Mr. White had the following severe

impairments: (1) status post right sided L5–S1 microdiscectomy with radiculopathy; (2) moderate glenohumeral arthritis of the right shoulder; (3) obstructive sleep apnea; (4) gastroesophageal reflux disease; (5) asthma; (6) obesity; (7) antisocial personality disorder; and (8) drug addiction disorders. (Tr. 72.)

Nevertheless, the ALJ concluded that Mr. White had the residual functional capacity to perform light work with certain exertional, environmental, and non-exertional limitations. (Tr. 76.) Specifically, Mr. White could occasionally reach overhead with the right arm but frequently reach in all other directions on that side. (*Id.*) He could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. (*Id.*) He could never climb ladders, ropes, or scaffolds. (*Id.*) He can never be exposed to unprotected heights or moving mechanical parts, and he could never operate a motor vehicle. (*Id.*) He could frequently be exposed to humidity and wetness, dust, odors, fumes, pulmonary irritants, extreme cold, and extreme heat. (*Id.*) He retained the ability to understand, remember, and apply information, and he could concentrate, persist, and maintain pace enough to perform simple, routine, and repetitive tasks outside of a production rate pace. (*Id.*) He was limited to simple work-related decisions in using judgment and dealing with changes in the work setting. (*Id.*) He was only able to interact occasionally with supervisors, coworkers, and the public. (*Id.*)

Based on those and other findings, the ALJ determined that Mr. White was not disabled. (Tr. 83–84.)

## B. <u>Personal, Educational, and Vocational Experience</u>

Mr. White was born in November 1979 and was 43 years old on the date of his current application. (*E.g.*, Tr. 39, 173.) He graduated high school and took some college courses. (Tr. 203.) He has worked as a cook, but he found that the work was causing him to have back spasms. (Tr. 45.)

3

Before that, he worked for years as a roofer, most recently in 2017. (Tr. 53, 203, 328.) Mr. White lives with his teenage daughter. (Tr. 53.)

    **C.**    **Function Reports**

    Mr. White completed a function report on March 13, 2023. (Tr. 218–24.) He described that, on an average day, he will wake up and "pace the floor" until his back stops hurting. (Tr. 218.) He will then shower, which he described as "trying to ease the pain," and then attempt to exercise as directed by his physical therapist. (*Id.*) He wrote that he is often in so much pain, though, that he wants to lie down. (*Id.*) Because lying down is also painful, he finds himself "tossing and turning" all day. (*Id.*)

    Mr. White said that his mother and daughter cook for him, and his daughter cares for the family dog. (*Id.*) He is able to dress himself, but he takes his time because doing so is difficult. (*Id.*) He is able to shower, but he does not take long showers because "it hurt[s] after a while." (*Id.*) He is able to shave, feed himself, and use the restroom. (*Id.*) If he finds himself cooking, he said he needs to take breaks because he cannot stand at the stove monitoring the food. (Tr. 219.) He does not do any chores, because standing, walking, and lifting cause him to be in pain. (*Id.*)

    Mr. White said that he is able to drive and ride in a car. (Tr. 220.) He does drive, and he is able to go out alone. (*Id.*) He shops in person once a month for food and hygiene products, but doing so can "take all day." (*Id.*) Otherwise, he does not go out because he experiences pain when he tries to go anywhere. (Tr. 221.)

    Mr. White used to enjoy reading and working on houses, but now he cannot lift anything or bend to perform his lifelong work. (*Id.*)

    Mr. White talks with others socially over the phone every other day. (Tr. 221.) He has no problems getting along with others. (*Id.*)

Mr. White estimated that he can walk for only "ten steps" before needing to rest for five to ten minutes. (Tr. 222.) He uses a cane in the morning, which he said was prescribed by a doctor "a while ago." (Tr. 223.)

He has no problems paying attention or following oral and written instructions. (Tr. 222.) He handles stress well. (Tr. 223.)

### D. Relevant Hearing Testimony

#### 1. Mr. White's Testimony

Mr. White testified that his last work—in 2019 as a cook—caused him to have back spasms "down to [his] legs and lower back." (Tr. 45, 53.) He described that the pain spreads from his lower buttocks down the back of his legs all the way to his feet. (Tr. 45–46.) Walking also causes him pain, but sitting is worse because it puts more pressure on his lower back. (Tr. 46.) He can only sit for 10 or 15 minutes before needing to get up and stretch. (*Id.*)

Mr. White has tried physical therapy, but he found that it made the pain worse such that he was "out of commission for a day or two" after sessions. (Tr. 47.) He has had two surgeries on his back, but the surgeries did not improve his pain either. (*Id.*)

Mr. White testified that he has carpal tunnel syndrome in both wrists, which causes "excruciating" pain when he tries to grab or hold onto objects. (Tr. 47–48.)

Mr. White also has arthritis in his right shoulder, which flares up from "time to time"; during flare ups he can barely lift his arm past his stomach. (Tr. 48–49.)

Mr. White's sleep apnea causes him to feel tired throughout the day. (Tr. 49.)

Mr. White estimated that he could stand or walk for only 10 minutes at a time. (Tr. 50.) After 10 minutes, he then spends 10 to 15 minutes on his knees with his upper body resting on something, a position that allows him to stretch and take some of the pressure off his back. (Tr. 50–51.) Mr. White said that he can lift and carry no more than 10 pounds, "if that." (Tr. 51.) He rated

5

his daily pain as a nine on a scale of one to ten; he is "always ready to go to the hospital." (Tr. 51–52.)

As Mr. White is not able to cook or clean, his teenage daughter takes care of those chores for him. (Tr. 52.) Mr. White does go to the grocery store with his daughter, but he moves slowly and then uses a motorized cart while inside the store. (Tr. 52–53.)

Mr. White has a driver's license and drives every day to take his daughter to and from school. (Tr. 55.)

Mr. White takes an antacid and has an inhaler, the latter of which he uses once a day. (*Id.*)

### 2. *Vocational Expert's Testimony*

Mia Heikkila testified as a vocational expert (VE) at the hearing. (Tr. 37.) The ALJ asked the VE to assume that a hypothetical individual is capable of light work with certain exertional and non-exertional limitations. (Tr. 59–60.) Specifically, the individual can occasionally reach overhead with the right upper extremity; occasionally climb ramps and stairs; and occasionally kneel, stoop, crouch, and crawl. (Tr. 59.) They would never be able to climb ladders, ropes, or scaffolds. (*Id.*) They can frequently balance. (*Id.*) They would need to avoid concentrated exposure to fumes, odors, gases, poorly ventilated areas, and extreme cold. (*Id.*) They must avoid hazards like heights and machinery, but they could navigate ordinary workplace hazards like boxes on the floor, open doors, or approaching vehicles and people. (*Id.*)

The VE testified that such a person would not be able to perform Mr. White's past relevant work but could perform other work that exists in the national economy, such as the work of a price marker (DOT 209.587-034), cashier II (DOT 211.462-010), or counter attendant (DOT 311.477-014). (Tr. 60.)

The ALJ next asked the VE to imagine that the hypothetical person is further limited. (Tr. 60–61.) They could only frequently be exposed to humidity and wetness, dust, odors, fumes,

pulmonary irritants, extreme heat, and extreme cold. (Tr. 61.) They would have the ability to understand, remember, and apply information—and to concentrate, persist, and maintain pace—but only to the extent necessary to complete simple, routine, and repetitive tasks outside of a production rate pace. (Tr. 61.) They would be limited to simple, work-related decisions and changes in the work setting. (*Id.*) They could only occasionally interact with supervisors, coworkers, and the public. (*Id.*)

The VE testified that such a person could still perform the work of a price marker, and could also perform the work of a routing clerk (DOT 222.687-022) and delivery marker (DOT 222.587-038). (Tr. 61)

The ALJ then asked the VE to assume that the hypothetical person would be further limited in that they could only stand and walk for four hours out of an eight-hour workday. (Tr. 62.)

The VE testified that such a person could still perform the work of a price marker, but the number of jobs available would be reduced by 75 percent. (*Id.*) The VE testified that approximately 32,800 jobs would remain. (*Id.*) The VE further testified that such a person could also perform the work of a small parts assembler (DOT 706.684-022)—although the number of jobs would be reduced to 4,400 jobs—or an inspector and hand packager (DOT 559.687-074) (again applying the reduction, to 2,200 jobs). (Tr. 62–63.)

The ALJ next asked whether there would be any jobs available if the hypothetical person was limited to the sedentary exertional level. (Tr. 63.)

The VE testified that such a person could perform the work of an electronics inspector (DOT 726.684-110), ticket checker (DOT 219.587-010), or polisher (DOT 713.684-038). (Tr. 63–64.)

The ALJ asked the VE whether competitive employment would be available to a person who needed frequent breaks, such that they would be off task for 20 percent of the workday. (Tr. 64.) The VE confirmed that no jobs would be available to such a person. (*Id.*)

Mr. White's counsel then asked the VE to imagine that a person could only stay seated for 10 to 15 minutes before needing to stand and walk for 10 minutes, and then would need to repeat that cycle throughout the day. (Tr. 65.) The VE confirmed that this would be work preclusive. (*Id.*)

### E.   State Agency Consultants

A disability examiner (Adella Pierson), a physician (Mehr Siddiqui, M.D.) and a psychologist (Irma Johnston, Psy.D.) reviewed Mr. White's claim at the initial review level. (Tr. 90–97.)

Dr. Johnston noted that, while the previous ALJ determined that Mr. White had certain mental health conditions and limitations, Mr. White's counsel had confirmed that Mr. White has no mental health conditions. (Tr. 94.) Dr. Johnston therefore opined that Mr. White had no severe mental health conditions and no more than mild mental health limitations. (*Id.*)

Dr. Siddiqui opined that Mr. White's allegations of back pain with standing and walking could be explained by his medically determinable impairments, but that his description of the limiting effect of those impairments was only partially consistent with the record. (Tr. 95.) Dr. Siddiqui explained that the reported debilitating effect of his impairments was greater than that substantiated by the medical record "given his mild [degenerative disc disease], intact strength, and full [range of motion]." (*Id.*)

Dr. Siddiqui adopted the residual functional capacity from Mr. White's previous application for SSI based on SSA's Acquiescence Ruling 98-4(6); the doctor reasoned that Mr. White's May

2023 spinal ablation procedure did not change his functional capacity. Tr. 95; *see also* Acquiescence Ruling 98-4(6), 63 Fed. Reg. 29,771, 1998 WL 274052 (June 1, 1998).[2]

Based on these opinions, the state agency consultants found that Mr. White was capable of performing the work of a merchandise marker (DOT 209.587-034), routing clerk (DOT 222.687-022), or router (DOT 222.587-038) and was not disabled. (Tr. 96–97.)

In a letter explaining this decision to Mr. White, the SSA wrote that medical records showed that he was able to stand, walk, and move about in a satisfactory manner, even if he cannot lift heavy objects and may experience discomfort at times. (Tr. 112.) The SSA further explained that although he may need to avoid working in very dusty environments, dangerous surroundings, or other similar places, he "would be able to do work in other settings." (*Id.*)

A disability examiner (Sarah Filanowski) and a physician (Shanker Gupta, M.D.) reviewed Mr. White's claim at the reconsideration level. (Tr. 98–105.)

Dr. Gupta affirmed that the agency's prior RFC was supported by the medical evidence. (Tr. 101.) He explained that there was no medical necessity for Mr. White to use a cane because the evidence showed that his gait was normal and there were no focal neurological deficits. (*Id.*) Dr. Gupta wrote that the alleged severity of Mr. White's functional limitations was only partially consistent with the medical records, also noting that Mr. White continued to be able to drive and shop in stores. (*Id.*)

Dr. Gupta opined that Mr. White could frequently lift and carry up to 10 pounds and occasionally lift and carry up to 20 pounds. (Tr. 103.) He could stand or walk for about six hours in an eight-hour workday and could sit for about six hours of that workday. (*Id.*) He could never

---

[2] The Agency would go on to rescind Acquiescence Ruling 98-4(6) on December 2, 2024, replacing it with Acquiescence Ruling 24-1(6). *See* Acquiescence Ruling 24-1(6), 89 Fed. Reg. 92922-02, 2024 WL 4870750 (Nov. 25, 2024).

climb ladders, ropes, or scaffolds but could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. (*Id.*) He could only occasionally reach overhead with the right upper extremity. (*Id.*) He must avoid unprotected heights and avoid working on moving machinery. (Tr. 104.) He must also avoid concentrated exposure to extreme cold, fumes, odors, dusts, gases, and poor ventilation. (*Id.*)

Based on these opinions, the consultants affirmed that Mr. White could perform the work of a merchandise marker, routing clerk, or router and was not disabled. (Tr. 105.)

In a letter explaining this decision to Mr. White, the agency wrote that although he cannot do any heavy lifting and would be limited in the amount of time he can spend climbing, balancing, stooping, kneeling, crouching, crawling, and reaching with right upper extremity, he remained able to lift lighter objects and can sit, stand, and walk for extended periods of time. (Tr. 119.)

### F.    Relevant Medical Evidence

Mr. White underwent a radiologic examination of his right shoulder on November 30, 2021. (Tr. 332.) The examination revealed moderate glenohumeral arthritis, characterized by mild to moderate glenohumeral joint space loss, mild medial humeral head osteophyte formation, and glenohumeral stenosis. (*Id.*) There was no acromioclavicular joint separation. (*Id.*)

Mr. White underwent a surgical laminectomy procedure of the spine on December 10, 2020. As of December 30, 2020, Mr. White's severe right leg pain was "gone." (Tr. 702.) He said he was ambulating regularly, although there was some residual discomfort in the right buttock and behind the right knee. (*Id.*)

Mr. White presented to the emergency room complaining of lower back pain on October 30, 2021. (Tr. 626.) Mr. White described that he had minimal improvement from his surgery and said his pain had been gradually worsening since the procedure. (*Id.*) On examination, Mr. White exhibited normal range of motion, normal strength, and intact sensation. (Tr. 628.) Mr. White had

a positive straight leg raise test on the right side at 30 degrees of flexion, although he remained able to ambulate. (*Id.*) There was generalized tenderness across the lumbar region, but no point tenderness, step-off, or visible injuries or redness. (*Id.*) The emergency room physician assistant opined that Mr. White's symptoms were consistent with sciatica; he was prescribed a pain medication and a muscle relaxant and instructed to follow up with his surgeon or with a pain management doctor. (*Id.*)

Mr. White had a follow up appointment regarding his spine surgery on November 17, 2021. (Tr. 617.) He reported that the surgery had improved his leg pain but said that in the last two months his lower back pain had gotten much worse. (*Id.*) On examination, Mr. White's spine visually appeared normal, and he had full strength in both upper and lower extremities. (Tr. 619.) He exhibited a normal gait. (*Id.*) The plan after the appointment was for Mr. White to engage in physical therapy and undergo x-ray imaging. (*Id.*)

Mr. White began physical therapy on November 30, 2021. (Tr. 608.) The therapist noted that Mr. White had not engaged in formal rehabilitation after his December 2020 spinal surgery. (*Id.*) Mr. White presented with decreased range of motion and decreased tolerance for movement, with pain present. (*Id.*) His pain had gotten worse through the year since the surgery. (Tr. 609.) The therapist noted that Mr. White ambulated at a slow speed and with a wider base of support. (Tr. 611.) He had limited step length and limited to no trunk rotation. (*Id.*)

Mr. White participated in a second physical therapy session on December 13, 2021. (Tr. 601). Mr. White told the therapist that a kneeling and forward flexed position was the most comfortable for him. (*Id.*)

Mr. White consulted with Sunny Lee, D.O.—an internal medicine doctor—on April 12, 2022, complaining of pain in his right foot. (Tr. 366.) Dr. Lee noted that Mr. White had previously

undergone a right-sided L5–S1 microdiscectomy and had sought treatment from orthopedic specialists in November 2021 for continued "sciatica pains." (*Id.*) She noted that Mr. White had been instructed to complete weeks of physical therapy and to follow up for an MRI if there was no improvement. (*Id.*) On examination, Mr. White had full strength in all extremities. (Tr. 368.) Dr. Lee suspected that the foot pain had been caused by tendinopathy triggered by Mr. White shifting his weight as a result of the pain in his back and right leg. (Tr. 370.) She prescribed an anti-inflammatory medication and instructed Mr. White to call his orthopedic surgeon "since they may wish to pursue [a] repeat MRI or further intervention. (*Id.*) X-ray imaging of the foot was normal. (Tr. 381–82.)

Mr. White presented to the emergency room on May 29, 2022, primarily for a headache but also complaining of back spasms. (Tr. 361.) On examination, Mr. White was tender to palpation over the lumbar paraspinal muscles on the right side, "with palpable spasm." (Tr. 363.) There was normal range of motion, and no deformity or swelling was noted. (*Id.*) No focal deficit was noted, and his gait and coordination were intact. (Tr. 364.) Mr. White was given medication that reduced his headache pain, and he was discharged. (Tr. 365.)

Mr. White consulted with Shrif Constandi, M.D., an interventional pain management doctor, on November 20, 2022. (Tr. 355.) Dr. Constandi noted that Mr. White had complained of back pain for years, although previous surgery had resolved the radicular component of the complaint. (Tr. 356.) Mr. White rated the pain as an eight on a ten scale and said that, on his best days, the pain is a six. (*Id.*) He said the pain interferes with physical activity and is exacerbated by sleeping, yard work, and housework. (*Id.*) On examination, there was no pain on palpation of the lumbar spine and full range of motion without reproducible pain. (Tr. 357.) He had full motor strength and tone, intact sensation, and a normal gait. (*Id.*)

Dr. Constandi referred Mr. White for continued physical therapy and ordered magnetic resonance imaging. (Tr. 358.) He counseled Mr. White on the importance of activity modification and exercise, among other things. (*Id.*)

Mr. White consulted with Tamara Howell—an advance practice registered nurse and certified nurse practitioner—on December 7, 2022. (Tr. 360.) Mr. White reported that he had been in continuous back pain since undergoing surgery in December 2020. (*Id.*) Ms. Howell ordered x-ray imaging and referred him "back to spine for further evaluation and management." (*Id.*)

The ordered lumbar x-ray revealed only "mild degenerative changes." (Tr. 359, 376.) Specifically, the imaging showed mild degenerative disc disease at the L5–S1 levels with disc height loss, degenerative endplate changes, and osteophytes. (Tr. 377.) There was minimal degenerative endplate changes observed at the L3–L5 levels. (*Id.*) And there was mild lower lumbar facet arthropathy. (*Id.*) The imaging confirmed that there was normal spine curvature, no significant spondylolisthesis, and preserved vertebral body heights. (Tr. 378.)

Mr. White began physical therapy on December 22, 2022. (Tr. 351.) The therapist noted that he presented with impairments to his activities of daily living, gait, overall function, range of motion, and strength—among other things—and that functional performance testing indicated that he was at risk of falling. (*Id.*) The plan was for Mr. White to attend 20 therapy sessions over 10 weeks. (Tr. 352.) Mr. White's pain had improved to some extent after the therapy session. (Tr. 353.)

Mr. White attended an aquatic physical therapy session on December 28, 2022, and the therapist noted "decreased symptoms." (Tr. 349.) However, Mr. White experienced difficulty and increased pain during one exercise, causing the therapist to end the exercise early. (*Id.*) Overall, his pain level was "better" after the session. (Tr. 350.)

Mr. White next participated in aquatic physical therapy on January 13, 2023. (Tr. 346.) He reported feeling "slightly 'looser'" after the session, and the therapist noted that he would continue to benefit from ongoing physical therapy. (*Id.*)

Mr. White consulted with Dr. Constandi again on January 17, 2023. (Tr. 343.) Mr. White complained of persistent aching low back pain, rating the pain as an eight on a ten scale. (*Id.*)

On examination, Mr. White displayed no pain on palpation of the lumbar spine, and there was again full range of motion "without reproducible pain." (Tr. 344.) Mr. White had normal motor strength and tone and intact sensation, and he walked with a normal gait. (*Id.*)

Dr. Constandi noted that computed tomography imaging showed degenerative spine changes or disc derangements, most notably at the L4–L5 and L5–S1 levels. (*Id.*) Comparing this imaging to CT imaging from May 2020, Dr. Constandi opined that "there is suggestion of progression of a central/RIGHT paracentral disc herniation superimposed on a disc-osteophyte complex, and with up to estimated moderate-severe right-sided spinal canal and lateral recess stenoses, . . . stable moderate neural foraminal stenoses[, and] [e]xiting/traversing nerve root compressions." (*Id.*) The overall impression from the imaging was that there was a right central disc extrusion at the L5–S1 level with suspected sequestered fragment, which was likely impinging on the descending right S1 nerve root and causing moderate narrowing of the spinal canal. (*Id.*) There was also severe right and moderate left foraminal stenosis at that level. (*Id.*)[3]

Dr. Constandi recommended that Mr. White continue with physical therapy until magnetic resonance imaging could be ordered and counseled Mr. White on "the importance of activity modification . . . [and] exercise . . . ." (Tr. 345.)

---

[3] These findings are similar to those reached after MRI imaging in October 2020. (Tr. 483–84.)

Mr. White participated in aquatic physical therapy on January 18, 2023. (Tr. 339.) The therapist noted that Mr. White had been seen for three sessions but was showing no improvement in sitting, rising from a chair, standing, walking, bending, negotiating stairs, or sleeping. (*Id.*) The therapist recommended continued aquatic therapy, noting that Mr. White showed improved activity tolerance in the pool. (*Id.*) She rated his prognosis as "fair." (*Id.*)

Mr. White consulted with Mariana Iskander, a physician assistant, on February 7, 2023. (Tr. 397.) He complained that his pain had gotten worse since his last appointment and was currently a nine out of ten. (*Id.*) He said that physical therapy was making the pain worse and that he was not taking medication because "they do not help." (*Id.*) On examination, his bilateral upper and lower extremity strength was normal, and there were no atrophy or tone abnormalities noted. (Tr. 399.) His gait was normal. (*Id.*) There was no pain on palpation over the spine, and Mr. White's range of motion was normal without reproducible pain. (Tr. 398.) Ms. Iskander prescribed an anticonvulsant medication and ordered an MRI to be completed after his final session of physical therapy. (Tr. 399.) The plan was to consider injection treatment pending the results of the MRI. (*Id.*)

Mr. White completed his last physical therapy session on February 15, 2023. (Tr. 394.) The therapist noted that he demonstrated improvements in his ability to tolerate more exercise with fewer breaks. (*Id.*) She recommended that he continue going to physical therapy. (*Id.*) But Mr. White complained that the pressure and pain in his back returns after each session once he gets out of the pool. (Tr. 395.)

Mr. White underwent an MRI on March 4, 2023. (Tr. 393.) The technician noted that Mr. White was not currently using an ambulatory assistance device like a cane. (*Id.*)

15

This MRI was compared against Mr. White's October 2020 MRI. (Tr. 401.) The imaging revealed "improved but residual soft tissue in the right lateral recess." (Tr. 400.) The radiologist wrote that this could be "residual/recurrent disc herniation" or postoperative scar formation, but he could not distinguish between the two without intravenous contrast. (Tr. 400–01.)

The MRI also showed "low-grade" degenerative changes in the lumbar spine. (Tr. 401.) Specifically, there was mild disc height loss at the L5–S1 levels, with disc desiccation noted at the L4–L5 and L5–S1 levels. (Tr. 402.) There were no changes from Mr. White's 2020 MRI observed at the L1–L2, L2–L3, and L3–L4 levels, with only minimal to moderate findings at those levels. (*Id.*) At the L5–S1 levels, the radiologist wrote that the spinal canal and lateral recess patency had improved since the 2020 scan. (Tr. 403.) But there was moderate to severe right and moderate left neural foraminal narrowing at that level. (*Id.*) There was also low signal and architectural distortion noted in the right lateral recess about the right S1 nerve root sleeve. (*Id.*)

Mr. White consulted with Ms. Iskander on March 7, 2023. (Tr. 428.) Mr. White reported that his pain had been worsening since the last appointment. (*Id.*) He said that physical therapy had been making his pain worse. (*Id.*) Ms. Iskander reviewed the recent MRI report, documenting that the overall impression from the scan was that there were no acute osseous abnormalities and only "mild degenerative changes" otherwise. (Tr. 429.) On examination, Mr. White's bilateral upper and lower extremity strength was normal and symmetric, with no atrophy or tone abnormalities noted. (Tr. 430.) His gait was normal. (*Id.*) There was no pain on palpation of the spine and normal range of motion of the spine without reproducible pain. (*Id.*) The plan was for Mr. White to undergo a basivertebral nerve ablation procedure, also known as an Intracept procedure. (*Id.*)

Mr. White presented for a preoperative physical examination on April 21, 2023. (Tr. 423.) He rated his pain as an eight on a ten scale. (Tr. 425.) On examination, his gait was normal, and no neurological or sensory deficits were noted. (*Id.*)

Mr. White underwent the Intracept surgery on May 4, 2023. (Tr. 421). The surgery was successful, with Mr. White endorsing "some overall relief" in the days following the procedure. (Tr. 422.)

Mr. White consulted with Ms. Iskander on May 9, 2023, following up on the Intracept procedure and for the removal of sutures. (Tr. 415.) Mr. White reported that his symptoms were "much improved" since the procedure; he rated his pain as only a five out of ten, and the pain was identified as soreness around the surgery site. (*Id.*) Ms. Iskander recommended exercise in the form of swimming, use of a stationary bike, and home exercise. (*Id.*) Mr. White was instructed to call or return if the pain increased, but otherwise he was scheduled for a follow up in three months. (*Id.*)

There is no evidence that Mr. White followed up with the pain management clinic for additional spine care after this appointment.

Mr. White consulted with Brandon Francis, an internal medicine resident, on May 26, 2023. (Tr. 589.) Mr. White complained of peripheral neuropathy, specifically bilateral hand burning and tingling, that he said arose after the Intracept procedure. (*Id.*) He also reported numbness extending from his buttocks down the back of his legs. (*Id.*) He denied any other concerns. (*Id.*) On examination, there was a positive Phalen's sign, leading Dr. Francis to opine that Mr. White probably had bilateral carpal tunnel syndrome unrelated to the Intracept procedure. (Tr. 591–92.) Mr. White was prescribed wrist braces and instructed to follow up in five weeks. (Tr. 589, 592.) Dr. Francis also instructed Mr. White to follow up with his pain management providers. (Tr. 589.)

Mr. White presented to the emergency room on August 22, 2023, for a matter unrelated to the issues in this appeal. (Tr. 577.) In relevant part, though, hospital records reflect that Mr. White did not complain of back pain during the review of symptoms. (*See* Tr. 578.)

Dr. Francis completed a medical source statement on January 16, 2024. (Tr. 950–53.) Dr. Francis identified that Mr. White had been diagnosed with vertebrogenic low back pain, intractable back spasms, and chronic back pain. (Tr. 950.) He opined that these conditions were "unlikely to improve," referring to clinical findings that the strength in Mr. White's lower extremities was "extremely limited," paraspinal tenderness on examination, and the MRI of Mr. White's lumbar spine. (*Id.*)

Dr. Francis opined that Mr. White could sit or stand for only 10 minutes at a time. (Tr. 951.) The doctor identified that Mr. White could sit for less than two hours in a normal workday and stand or walk for less than two hours. (*Id.*) He further opined that Mr. White would need to get up and walk for two minutes at ten-minute intervals and would further need an unscheduled 20 minute break every 15 minutes. (*Id.*) Dr. Francis wrote that Mr. White needed to use a cane or other hand-held assistive device. (Tr. 952.) He opined that Mr. White was limited in his ability to lift and carry objects and in his ability to twist, stoop, crouch, climb stairs, and climb ladders. (*Id.*)

Dr. Francis estimated that Mr. White would be off task for 20 percent of the workday and was incapable of even low stress work. (Tr. 953.)

## IV.    THE ALJ'S DECISION

The ALJ found that Mr. White had not engaged in substantial gainful activity since December 19, 2022, the alleged onset date. (Tr. 21.)

The ALJ next determined that Mr. White had the following severe impairments: (1) degenerative disk disease of the lumbar spine, with vertebrogenic back pain and chronic pain; (2) degenerative joint disease of the right shoulder; (3) moderate glenohumeral arthritis;

18

(4) obesity; (5) obstructive sleep apnea; and (6) asthma. (*Id.*)

The ALJ then concluded that none of Mr. White's impairments, whether considered singly or in combination, met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.*)

The ALJ determined that Mr. White had the residual functional capacity ("RFC") to perform a full range of work at the light exertional level with a number of additional limitations. (Tr. 23.)

With respect to exertional and environmental limitations, Mr. White is only capable of standing and walking for four hours out of an eight hour workday. (*Id.*) He can only occasionally push or pull with the right upper extremity, reach overhead, and climb ramps and stairs. (*Id.*) He can frequently balance but only occasionally kneel, stoop, crouch, and crawl. (*Id.*) He can never climb ladders, ropes, or scaffolds, and he must avoid exposure to extreme cold and concentrated exposure to dust, fumes, odors, gases, and poorly ventilated areas. (*Id.*) He is able to avoid ordinary hazards in the workplace (boxes on the floor, open doors, approaching vehicles and people, and the like) but must not be exposed to hazards like "heights or machinery." (*Id.*) He can frequently be exposed to humidity and wetness, dust, odors, fumes and pulmonary irritants, extreme cold, and extreme heat. (*Id.*)

With respect to non-exertional limitations, Mr. White has the ability to understand, remember, and apply information; he can concentrate, persist, and maintain pace to perform simple, routine, and repetitive tasks. (*Id.*) He cannot perform at a production rate pace (*e.g.*, assembly line work). (*Id.*) He is limited to simple work-related decisions in using his judgment and dealing with changes in the work setting. (*Id.*) He is able to occasionally interact with supervisors, coworkers, and the public. (*Id.*)

The ALJ concluded that Mr. White was unable to perform his past relevant work a roofer. (Tr. 30.) The ALJ found that Mr. White had a high school education and was 43 years old on the date of his disability application. (*Id.*)

The ALJ then determined that—considering Mr. White's age, education, work experience, and RFC—there were jobs that existed in significant numbers in the national economy that he could perform, including work as a "price marker" (DOT 209.587-034), "small parts assembler" (DOT 706.684-022), or "inspector – hand packer" (DOT 559.687-074).[4] (Tr. 31.)

The ALJ found that the available jobs as a "price marker" would be reduced by 75 percent as a result of Mr. White's walking and standing limitation, but that there would still be 32,800 jobs nationally. (*Id.*)

Accordingly, the ALJ concluded that Mr. White was not disabled. (Tr. 32.)

## V.     LAW & ANALYSIS

### A.     <u>Standard of Review</u>

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 Fed. Appx. 315, 320 (6th Cir. 2015) (quoting *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)); *see also* 42 U.S.C. § 405(g).

"Under the substantial evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficient evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 587 U.S. 97, 102 (2019) (cleaned up) (quoting *Consolidated Edison Co. v.*

---

[4] These jobs refer to entries in the U.S. Department of Labor's *Dictionary of Occupational Titles*. The DOL no longer publishes the tool—*see Browning v. Colvin*, 766 F.3d 702, 709 (7th Cir. 2014)—but the most recent version, from 1991, is available online through the DOL's Office of Administrative Law Judges Law Library. *Dictionary of Occupational Titles—Fourth Edition, Revised 1991*, U.S. DEPT. OF LABOR OFF. OF ADMIN. L. JUDGES, https://www.dol.gov/agencies/oalj/topics/libraries/LIBDOT.

*NLRB*, 305 U.S. 197, 229 (1938)). The standard for "substantial evidence" is "not high." *Id*. While it requires "more than a mere scintilla," "[i]t means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id*. (quoting *Consolidated Edison*, 305 U.S. at 229).

In addition to considering whether substantial evidence supports the Commissioner's decision, the Court must determine whether the Commissioner applied proper legal standards. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.*, *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, . . . a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)) (alteration in original).

**B.**     **Standard for Disability**

Consideration of disability claims follows a five-step review process. 20 C.F.R. § 416.920. First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. § 416.920(b). Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. § 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or

mental ability to do basic work activities." *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990) (quoting 20 C.F.R. §§ 404.1520(c) and 416.920(c)).

Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. § 416.920(d).

Before considering Step Four, the ALJ must determine the claimant's residual functional capacity, *i.e.*, the claimant's ability to do physical and mental work activities on a sustained basis despite limitations from her impairments. 20 C.F.R. § 416.920(e). An RFC "is the most [a claimant] can still do despite [the claimant's] limitations." 20 C.F.R. § 416.945(a)(1). Agency regulations direct the ALJ to consider the functional limitations and restrictions resulting from a claimant's medically determinable impairment or combination of impairments, including the impact of any related symptoms on the claimant's ability to do sustained work-related activities. *See* Social Security Ruling ("SSR") 96-8p, 1996 WL 374184 at *5 (July 2, 1996).

"A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner." *Golden v. Berryhill*, No. 1:18CV00636, 2018 WL 7079506, at *17 (N.D. Ohio Dec. 12, 2018), *report and recommendation adopted sub nom*, 2019 WL 415250 (N.D. Ohio Feb. 1, 2019). The ALJ is "charged with the responsibility of determining the RFC based on [the ALJ's] evaluation of the medical and non-medical evidence." *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 728 (6th Cir. 2013). "[T]he ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support [the ALJ's] decision, especially

when that evidence, if accepted, would change [the ALJ's] analysis." *Golden*, 2018 WL 7079506 at *17.

At the fourth step, if the claimant's impairment or combination of impairments does not prevent her from doing her past relevant work, the claimant is not disabled. 20 C.F.R. §§ 416.920(e)–(f). For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, the claimant is not disabled if other work exists in the national economy that the claimant can perform. 20 C.F.R. § 416.920(g). *See Abbott*, 905 F.2d at 923.

**C.      Analysis**

Mr. White's two assignments of error raise interrelated and sometimes overlapping issues. Through them, he argues both that the ALJ failed to adequately evaluate the subjective descriptions of his pain and its limiting effect, and that the ALJ erred in his consideration of the medical opinion evidence. As presented in the briefing, both assignments of error touch on both arguments.

For clarity and efficiency, the Court will separate the arguments and take them out of order. It will first consider all the arguments related to medical opinion evidence (the thrust of the second assignment of error). Then it will consider all the arguments regarding Mr. White's subjective symptoms (the focus of the first assignment of error).

### *1.      Second Assignment of Error – Residual Functional Capacity*

In his second assignment of error, Mr. White argues that the ALJ erred when he concluded that Mr. White had the residual functional capacity for work at the light exertional level. He argues that this conclusion is not supported by substantial evidence and that the ALJ failed to adequately explain how the objective medical evidence and the medical opinion evidence supports that finding. Further, he argues that the ALJ erred in crediting the state agency consultants' opinions over that of Dr. Francis, one of Mr. White's treating physicians. Mr. White points out that the

consultants "were unaware the ablation had failed" and did not review Dr. Francis's opinion before concluding that Mr. White could perform work at the light exertional level.

The Commissioner defends the ALJ's decision, pointing out that the ALJ found the agency consultants' opinions only partially persuasive and adopted an RFC that was more limited than that found in those opinions. The agency further argues that the ALJ's conclusion with respect to Dr. Francis's opinion was supported by substantial evidence.

After careful consideration, the Court agrees with the Commissioner.

Social Security Ruling ("SSR") 98-6p provides that "[i]f the RFC assessment conflicts with an opinion from a medical source, the [ALJ] must explain why the opinion was not adopted." 1996 WL 374184, at *7 (July 2, 1996).

Agency regulations state that the Social Security Administration "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's] medical sources." 20 C.F.R. § 404.1520c(a).

 Instead, the SSA considers opinions from medical sources under five factors: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) other factors, such as familiarity with other evidence in the claim or with the disability program's policies and evidentiary requirements. 20 C.F.R. § 404.1520c(c). Section 404.1520c(b)(1) specifically provides that "it is not administratively feasible for [the ALJ] to articulate in each determination or decision how [the ALJ] considered all of the factors for all of the medical opinions and prior administrative medical findings in your case record." 20 C.F.R. § 404.1520c(b)(1). Of the five factors, supportability and consistency are the most important, and an ALJ must explain how the

ALJ considered them. 20 C.F.R. § 404.1520c(b)(2). The ALJ "may" but "is not required to" explain how the ALJ considered the remaining factors. Id.

The "supportability" factor looks to how well the medical source supports the opinion with objective medical evidence from the record. *See* 20 C.F.R. § 404.1520c(c)(1). "In other words, the supportability analysis focuses on the physicians' explanations of the opinions." *Lavenia v. Comm'r of Soc. Sec.*, No. 3:21cv674, 2022 WL 2114661, at *2 (N.D. Ohio June 13, 2022) (*quoting Coston v. Comm'r of Soc. Sec.*, No. 20-12060, 2022 WL 989471, at *3 (E.D. Mich. Mar. 31, 2022)). The "consistency" factor looks to how consistent the medical opinion is with evidence from other medical and nonmedical sources. *See* 20 C.F.R. § 404.1520c(c)(2).

"As long as the ALJ discussed the supportability and consistency of the opinion and supported [the ALJ's] conclusions with substantial evidence within his decision, the Court will not disturb [the ALJ's] decision." *Njegovan v. Comm'r of Soc. Sec.*, No. 5:21-CV-00002-CEH, 2022 WL 1521910, at *4 (N.D. Ohio May 13, 2022).

Mr. White does not cite significant caselaw in support of his position. He focuses his argument on Dr. Francis's medical source statement opining that Mr. White had functional limitations that would preclude competitive employment. In doing so, Mr. White tacitly concedes that the ALJ considered both supportability and consistency with respect to Dr. Francis's medical source statement and the opinions of the state agency consultants.

While Mr. White is correct that Dr. Francis filled out his medical source statement in December 2024, the agency is correct that the ALJ's finding with respect to its persuasiveness is supported by substantial evidence. In other words, the conclusion was supported by "'such relevant evidence as a reasonable mind might accept as adequate to support'" the ALJ's conclusions.

25

*Biestek v. Berryhill*, 587 U.S. 97, 102 (2019) (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229 (1938)).

"The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts." *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)). "[T]he Commissioner's decision cannot be overturned if substantial evidence, or even a preponderance of the evidence, supports the claimant'' position, so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Com''r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). A reviewing court may not "try the case de novo, nor resolve conflicts in evidence, nor decide questions of credibility." *O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. 2020) (quoting *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984)).

Here, the ALJ found Dr. Francis to be not persuasive. The ALJ reasoned as follows, in part:

> The extent of limitations imposed by Dr. Francis's opinions and necessity of an assistive device are not consistent with the record. At times, the claimant had some degree of remarkable examination findings, as noted above, and attended routine physical therapy sessions . . ., but the more complete medical record contains relatively unremarkable examination findings . . . . .

(Tr. 29–30.)

That conclusion was reasonable. Dr. Francis had examined Mr. White once, at an appointment primarily focused on Mr. White's carpal tunnel symptoms. On examination, Mr. White's findings were largely unremarkable, and he was again instructed to follow up with his pain management providers, but there is no evidence that Mr. White did so. (Tr. 589.) The objective medical evidence does not support Dr. Francis's opined limitations, especially considering the context in which Mr. White consulted with Dr. Francis.

26

Specifically, as the ALJ noted, in numerous appointments specifically focused on Mr. White's spine pain, physical examinations revealed intact strength and sensation, no pain on palpation of the lower spine, and full range of motion without reproducible pain. (*See* Tr. 344, 357, 398, 430.) Radiological imaging revealed degenerative changes, but these were repeatedly described as "mild" or "low grade." And Mr. White endorsed improved symptoms after the Intracept procedure, which limited to no medical records documenting ongoing significant back pain after that procedure.

Turning to the ALJ's consideration of the consultants' medical opinion evidence, the Commissioner is correct that the ALJ found the agency consultants' opinions only partially persuasive. (Tr. 28.) The ALJ limited Mr. White's RFC beyond that recommended by the consultants, finding that the record supported limiting Mr. White to standing and walking four hours in an eight-hour workday. (Tr. 29.)

In coming to these conclusions, the ALJ fully and accurately summarized Mr. White's allegations regarding the extent of his pain. (Tr. 24.) The ALJ then went on to identify the evidence supporting a conclusion that Mr. White was not disabled, including by accurately summarizing the material relevant objective medical evidence and other evidence in the record, including evidence that Mr. White was able to drive and go out alone (*Id.*)

The Court has thoroughly reviewed Dr. Francis's medical source statement—drafted with the benefit of apparently only one consultation—and finds that the ALJ did not commit reversible error in finding that opinion not persuasive in the face of physical examination findings over the course of treatment revealing only mild to moderate degenerative spine changes.

In other words, the ALJ complied with the Commissioner's regulations in evaluating Dr. Francis's and the state consultants' opinions and made findings supported by substantial evidence. Accordingly, Mr. White's second assignment of error is overruled.

### 2. *First Assignment of Error – Evaluation of Mr. White's Pain*

In his first assignment of error, Mr. White contends that the ALJ failed to properly evaluate his subjective statements about the pain and functional limitations he experiences, in violation of Social Security Ruling 16-3p. *See* SSR 16-3p, 2017 WL 5180304 (Oct. 25, 2017). He argues that his description of his pain and its limiting effect are supported by his own testimony, Dr. Francis's medical opinion, and the failure of significant treatment to provide any relief. He points out that the ALJ did not mention the January 2023 CT imaging, which showed both that a disc extrusion was likely impinging on a nerve root and severe right and moderate left foraminal stenosis, among other things. He argues that the ALJ further failed to adequately evaluate the significance of the March 2023 MRI imaging. He says that these two scans, combined with the fact that he has undergone two surgical procedures, provide objective evidence overwhelmingly supporting his subjective testimony.

The Commissioner defends the ALJ's decision, arguing that the ALJ adequately summarized Mr. White's subjective complaints before reasonably finding that they were not fully consistent with the objective medical evidence. The agency insists that the ALJ did not singularly focus on objective evidence but also analyzed the subjective statements in the context of opinion evidence, treatment, and activities of daily living. And it says that the ALJ's conclusions in this regard were supported by substantial evidence.

The Commissioner is again correct.

SSR 16-3p provides that the SSA will conduct a two-step process in considering a claimant's symptoms. SSR 16-3p, 2017 WL 5180304, at *3 (Oct. 25, 2017). At step one, the SSA

determines whether the individual has one or more medically determinable impairments that could reasonably be expected to produce the individual's alleged symptoms. *Id.* If so, at step two, the SSA evaluates the intensity and persistence of a claimant's symptoms—including pain—to determine the extent to which those symptoms limit the claimant's ability to work. *Id.* at *4.

With respect to a claimant's subjective statements, SSR 16-3p provides that the SSA will "consider an individual's statements about the intensity, persistence, and limiting effects of symptoms" and "will evaluate whether the statements are consistent with objective medical evidence and the other evidence." *Id.* at *6.

SSR 16-3p identifies seven factors that the SSA will consider in evaluating an individual's symptoms: (1) daily activities; (2) the location, duration, frequency, and intensity of pain or other symptoms; (3) factors that precipitate and aggravate symptoms; (4) the type, dosage, effectiveness, and side effects of any medication; (5) treatment an individual receives or has received other than medication; (6) any measures other than treatment an individual uses or has used; and (7) any other factors concerning the claimant's functional limitations and restrictions. *Id.* at *7–8. "The ALJ need not analyze all seven factors but should show that she considered the relevant evidence." *Phillips v. Comm'r of Soc. Sec.*, No. 3:22-CV-01144-JGC, 2023 WL 4078204, at *8 (N.D. Ohio Apr. 4, 2023), *report and recommendation adopted*, 2023 WL 5602726 (N.D. Ohio Aug. 30, 2023).

Notably, "[a] plaintiff does not demonstrate a violation of SSR 16-3p simply by reiterating the same subjective symptoms she believes should have been credited by the ALJ, as an ALJ is not required to accept a claimant's subjective complaints." *Zingale v. Kijakazi*, No. 1:20-cv-02197, 2022 WL 824148, at *8 (N.D. Ohio Mar. 18, 2022); *see also Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003) ("[A]n ALJ is not required to accept a claimant's subjective complaints"). Moreover, "[i]t is for the administrative law judge, not the reviewing court, to judge

the consistency of a claimant's statements." *Lipanye v. Comm'r of Soc. Sec.*, 802 F. App'x 165, 171 (6th Cir. 2020). However, while determinations regarding subjective complaints rest with the ALJ, "those determinations must be reasonable and supported by substantial evidence." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 249 (6th Cir. 2007).

Here, the ALJ thoroughly and accurately summarized Mr. White's allegations and testimony regarding his symptoms and their limiting effect. (*See* Tr. 24–25.) The ALJ then, reasonably, found that his medically determinable impairments could cause his symptoms. (*Id.*) But the ALJ ultimately concluded that Mr. White's allegations about the debilitating effect of his pain was not fully supported by the record.

This conclusion was reasonable. An ALJ is not required to discuss every piece of evidence in the record. *E.g.*, *Thacker v. Comm'r of Soc. Sec.*, 99 Fed. App'x 661, 665 (6th Cir. 2004). Here, the ALJ discussed the relevant imaging (MRI imaging was discussed in the medical records as preferrable to CT imaging) and accurately found that—during physical examinations, Mr. White's gait was normal. The ALJ acknowledged Mr. White's testimony and the records reflecting decreased range of motion, antalgic gait, and pain. (*E.g.*, Tr. 26.) The ALJ weighed that evidence against the numerous instances where examinations were materially normal. The ALJ further correctly assessed that physical therapy resulted in improvement in Mr. White's ability to tolerate movement, with further beneficial effects expected from continued sessions. And the ALJ accurately reviewed the MRI imaging as revealing low-grade degenerative changes within the lumbar spine that are not suggestive of further limitations. (Tr. 27.)

In conclusion, the Court agrees that the ALJ did not singularly focus on objective evidence but properly analyzed Mr. White's subjective statements in the context of all opinion evidence, his

treatment, and his activities of daily living. The ALJ's conclusions in this regard were supported by substantial evidence.

Accordingly, Mr. White's first assignment of error is overruled.

**VI.    CONCLUSION**

Having overruled Mr. White's assignments of error for the reasons set forth above, the Court AFFIRMS the Commissioner's final decision.

Dated:  <u>February 2, 2026</u>                    /s *Jennifer Dowdell Armstrong*
                                                                     Jennifer Dowdell Armstrong
                                                                     U.S. Magistrate Judge